IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Sinaloa Hobson | * |
| 6232 Gothic Lane | |
| Bowie, Maryland 20720 | |
| | * |
| *Plaintiff* | |
| v. | Case No.: _____ |
| | |
| National Railroad Passenger Corporation | * |
| (AMTRAK) | |
| 60 Massachusetts Ave NE | |
| Washington, DC 20002-4285 | * |

Serve On:     Joseph H. Boardman
              President and Chief Executive Officer
              60 Massachusetts Ave NE
              Washington, DC 20002-4285

*Defendant*
*********************************************************************************

## COMPLAINT

Plaintiff Sinaloa Hobson, by and through her undersigned counsel Governor E. Jackson, III of the Law Offices of Governor E. Jackson, III LLC hereby files this Complaint and sues Defendant National Railroad Passenger Corporation (AMTRAK) and states that Plaintiff brings forth this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. In furtherance of this action, Plaintiff states as follows:

## PARTIES

1.   Plaintiff Sinaloa Hobson, at all times relevant, resided at 6232 Gothic Lane, Bowie, Maryland 20720. Plaintiff Hobson is an African-American female and began working for the Defendant in 2007.

2.   Defendant National Railroad Passenger Corporation, doing business as Amtrak, is a

partially government-funded American passenger railroad service. It is operated and managed as a for-profit corporation, and provides medium- and long-distance intercity service in 46 of the 48 contiguous United States. This Defendant's headquarters is located in Washington, D.C., and in fiscal year 2014, this Defendant served approximately 30.9 million passengers and had $2.189 billion in revenue while employing more than 20,000 people.[1] Amtrak was founded in 1971 through the government-sponsored consolidation of most of the preexisting passenger rail companies in the United States. This Defendant's services fall into three groups: short-haul service on the Northeast Corridor (NEC), short-haul corridor service outside the Northeast Corridor, and long-distance service. Routes vary widely in frequency of service, from three-days-a-week trains to weekday service several times per hour on the NEC. The most popular and heavily used services are those running on the NEC, including the Acela Express and Northeast Regional. The NEC runs from Boston to Washington, D.C. via New York City and Philadelphia. Four of the six stations busiest by boardings are on the NEC: New York (Penn Station)(first), Washington (Union Station)(second), Philadelphia (30th Street Station)(third), and Boston (South Station) (sixth). The other two are Chicago (Union Station)(fourth) and Los Angeles (Union Station)(fifth).

3.   Defendant National Railroad Passenger Corporation has been plagued with deeply entrenched labor relations problems involving racial discrimination and discrimination based on sex. According to the Wall Street Journal, on July 2, 1999 Amtrak agreed to settle a racial-discrimination lawsuit filed in this Court by paying $8 million and making extensive changes in its human-resources practices to combat future discrimination against black

---

[1] *See* Amtrak.com. October 2014: "National Fact Sheet: FY 2012."

managers.[2] As a condition of the settlement, this Defendant said it would change its hiring, promotion and performance-appraisal procedures to make them more evenhanded and also agreed to completely revamp its internal equal-employment-opportunity investigation and enforcement procedures. According to the Equal Employment Opportunity Commission (EEOC), on November 10, 2011, Amtrak agreed to pay $171,483 to settle a sex-based wage discrimination and retaliation lawsuit filed by the EEOC on behalf of an underpaid female human resources manager, and also agreed to enter into a two-year consent decree prohibiting Amtrak from engaging in any further sex discrimination or retaliation and requiring the rail carrier to provide four hours of training to senior human resources staff on anti-discrimination laws, as well as post a remedial notice at Amtrak's six regional offices and corporate headquarters.[3] This particular lawsuit, filed by the EEOC, specifically alleged Amtrak suppressed the female manager's pay while giving her a greater workload than it gave to her two male counterparts, and that she was refused a raise above her male counterparts despite her heavier workload.

## JURISDICTION & VENUE

4.   With respect to the federal claims asserted herein, the Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331 and §1343(a)(3) and (4) for the violation of plaintiff's federal statutory rights. Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) and §1391 (c), because Defendants have their headquarters, can be found and conduct business in the District of Columbia, and because the cause of action has arisen and occurred in the District of Colombia.

5.   Plaintiff filed the instant Complaint within 90 days of receipt of a Notice of Right to

---

[2] *See* http://www.wsj.com/articles/SB93087610774777627
[3] *See* http://www.eeoc.gov/eeoc/newsroom/release/11-10-11a.cfm

Sue letter from the United States Equal Employment Opportunity Commission ('EEOC"),

specifically EEOC Charge No. 570-2016-00164.

6.  At all times relevant Defendant National Railroad Passenger Corporation has been

doing business in the District of Columbia and has employed more than fifteen (15) employees.

7.  At all relevant times Defendant National Railroad Passenger Corporation has

continuously been an employer engaged in an industry affecting commerce within the meaning

of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §2000e-(b), (g) and (h).

## FACTS COMMON TO ALL COUNTS

8.  Plaintiff Hobson incorporates by reference paragraphs 1-7 as though fully

stated herein.

9.  Since the beginning of Claimant Sinaloa Hobson's employment with Amtrak,

Claimant Hobson has been aware of Amtrak's anti-discrimination and anti-harassment policy

which states in relevant part as follows:

> "3.0 Policy: Amtrak strictly prohibits discrimination and harassment based on a
> covered individual's race/color, sex (including gender), religion, national
> origin/ethnicity, age, disability, veteran status, sexual orientation or other personal
> characteristics protected by law. Amtrak also strictly prohibits retaliation.
> Violation of this policy constitutes an act of serious misconduct that can result in
> disciplinary action, up to and including termination. This policy applies to all
> applicants and employees (current and former), whether related to conduct
> involving fellow employees or a third-party (e.g. customers, outside vendors,
> persons doing business with Amtrak, and company visitors). Conduct prohibited
> by this policy is unacceptable in the workplace and in any work-related setting
> outside the workplace, such as during business trips, layovers, business meetings
> and business-related social events."
>                   ********************************************
> "4.1 Discrimination: Unfair treatment of or preference for an individual because
> of his/her personal characteristics protected by law. This may include, but is not
> limited to: (a) taking an adverse employment action such as firing someone,
> refusing to hire someone, or promoting someone less qualified because of race,
> age, disability, or other protected personal characteristics, (b) assigning
> individuals who work with clients or customers to certain departments, accounts

or jobs because the client or customer demands or requests individuals of a certain race, religion, national origin, or other protected personal characteristics."

              \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"4.3 Retaliation: Threats or actions taken to get even with or punish an individual for (1) reporting discrimination or harassment; (2) assisting in making a discrimination or harassment complaint; (3) cooperating in a discrimination or harassment investigation; or (4) filing a complaint with the Equal Employment Opportunity Commission (EEOC) or other government agency authorized to handle discrimination and harassment complaints. This may include, but is not limited to: (a) disciplining, changing work assignments of, more closely scrutinizing, providing inaccurate work information to, or refusing to cooperate or discuss work-related matters with an individual because the individual filed a Complaint with the Dispute Resolution Office, (b) covering up or attempting to cover up discriminatory or harassing conduct."

10. In 2007, Plaintiff Sinaloa Hobson began working for Amtrak in the Regional Mechanical Department as an electrician at a pay rate of $20.04 per hour. She successfully completed her duties in this position without any record of imposed discipline for approximately two years. In the early months of 2009, Plaintiff Hobson transitioned into Amtrak's High Speed Rail Mechanical Department as an electrician, and it was this transition that marked the unfortunate beginning of woeful experiences of Plaintiff Hobson rooted in pervasive gender discrimination and untoward acts of retaliation.

11. At the time of Plaintiff's transition into Amtrak's High Speed Rail Mechanical Department, she reported to the following individuals: Jeff Mead (Superintendent of High Speed Rail Department; White/Male), William "Bill" Vullo (Assistant Superintendent of High Speed Rail Track Department; White/Male), Kris Hamilton (General Foreman; White/Male), Gary Gutierrez (General Foremen; Hispanic/Male), Michael Lachica (Foreman and Union Representative; White/Male), and Anthony Kelley[4] (Foremen; Black/Male). Under this hierarchal structure, a "Foreman" was responsible for the oversight of electricians such as

---

[4] Anthony Kelley started working at Amtrak on August 18, 2008 and became a Foreman in the High Speed Rail Department on December 13, 2008.

Plaintiff Hobson, and a "General Foreman" was considered to be a management-level employee.

Shortly after Plaintiff's transition to this Department, she applied for the position of "High Speed

Trainset Supervising Technician"[5] (a.k.a. "Foreman"). To the surprise of the Plaintiff, at the time

of her application, Anthony Kelley was perpetuating a gender-based biased attitude toward

Plaintiff's perceived capabilities as a "Foreman" which was only brought to the attention of the

Plaintiff by chance as she received the following text message drafted on September 11, 2009 by

Anthony Kelley which was intended for a third party but accidentally sent to Plaintiff Hobson. It

stated:

> "Hobson is gonna be another lazy ass woman on da floor…Then she keeps
> downing 3rd and comparing us to 2nd. If she comes to 3rd my guys r gonna eat her
> alive."

Plaintiff Hobson showed a copy of the text message to Superintendent Jeff Mead, however, Mr.

Meade took no corrective action whatsoever. However, despite this known animus, Plaintiff

Hobson, after successfully completing the interview process and requisite testing, became a

"Foreman" on June 15, 2009. The remarkable nature of this accomplishment was underscored by

the fact that at this time, Plaintiff Hobson was one of two female "Foreman" in the High Speed

Rail Department.

12. Immediately, after assuming the position of "Foreman", Plaintiff Hobson's trials and

---

[5] According to Amtrak's Job Description, a High Speed Trainset Supervising Technician must possess the ability to record into the main computer system all material, repairs and corrective action taken by equipment number, as well as analyze this information. This position also requires that the employee be able to interpret diagnostic readouts and reports, and be capable of developing work assignments and material requirements to assure equipment servicing and repairs are performed in the most efficient manner and at the highest quality. This position includes assessment of supervisory/management skills, and receives the rate of pay received by Foreman III ($34.19 per hour), hence its colloquial reference as the job of "Foreman".

tribulations due to the gender-based discriminatory animus increased exponentially. For example, when Plaintiff Hobson would arrive for her shift and request at the outset a schedule of High Speed Rail trains that would be released, male employees Mike Lachica and Anthony Kelley would deliberately refuse to provide her this necessary information, thereby unnecessarily increasing the risk that trains would not run on schedule under Plaintiff's watch and therefore be attributed to Plaintiff's perceived lack of attention to detail and perceived failure to competently perform her job. Also, specifically in late November 2009, Plaintiff Hobson approached a General Foreman in the High Speed Rail Department to obtain information related to the shift turnover for High Speed Rail trains that she felt was necessary in order to effectively participate in a safety meeting that was scheduled to take place in December 2009. After requesting this information-much to Plaintiff Hobson's surprise- an impromptu meeting was convened on December 4, 2009 with Superintendent Jeff Mead, Assistant Superintendent "Bill" Vullo, and "Foreman" (and Union Representative) Michael Lachica wherein Mr. Mead told Plaintiff Hobson "You need to get your s**t together!" Mr. Mead did not at this time provide any clarification for the basis or substance of his embarrassing expletive-laden comment.

13. Despite Plaintiff Hobson being publicly berated and embarrassed by her superior employees for merely asking questions, Amtrak exhibited preferential treatment towards males in the Plaintiff's same position despite the male employees' clear violation of Amtrak's rules and protocols. For example, on December 13, 2008, while Anthony Kelley was on duty as "Foreman", an electronic derailment occurred which, according to Amtrak's protocols and procedures, should have required Mr. Kelley to receive a written reprimand including a Notice to Impose Discipline and undergo a urinalysis examination. However, neither Superintendent Jeff Mead, Assistant Superintendent Bill Vullo, the General Foreman on duty at that time (Chuck

Eckhard (White/Male), or the employee in charge of the transportation department (Lyle

Linderman (White/Male)) issued a written reprimand, nor did they require Mr. Kelley to submit

to a urinalysis examination. Even more appalling, shortly thereafter, on September 15, 2009, Mr.

Kelley was on duty when, under the influence of alcohol, another infraction occurred (known in

the industry as "blowing a caternary line") which should've warranted a Notice to Impose

Discipline and urinalysis examination; however rather than being subjected to formal discipline,

he was subsequently promoted to "General Foreman". Likewise, another example of preferential

treatment meted out based on gender is male Foreman, Jason Foxley, who "blew the caternary

line" on September 18, 2011, and his supervisor, Mike Hans (General Foreman; White/Male) did

not impose any formal discipline on Mr. Foxley for doing so. To wit, the leniency afforded to

Mr. Foxley was given even in light of his mutinous attitude towards management expressed in an

e-mail to Superintendent Jeffrey Mead two months prior (i.e. July 2011) to Mr. Foxley "blowing

the caternary line." The email stated in relevant part:

> "First of all I think you should understand something. If you haven't
> figured it out already. I am not, and have never been, a YES boy. I do my job
> every day to the best of my ability, and according to the rules, regulations, and
> policies that have been set forth. I will voice my opinion if I feel it needs to be
> heard, and I am not afraid to go against the grain if I feel that it needs to be done,
> and it is in the best interests of the company, or the employees. I will always place
> the needs of the employees above that of the company because if you have no
> employees, you have no company. If I feel like the course of action chosen is
> wrong, I will let my voice be heard and I will justify my reasoning's. If a
> particular plan of action does not make sense, or could be accomplished a
> different way I have no problem letting my idea be known so that a decision can
> be made. If my plan, or my ideas hurt someone else's feelings, or make them look
> stupid I really don't care; because if my plan or decision was chosen and executed
> it is because it was a better option.
>     As far as my TEST's go, if I choose to wait to do them, that is my right
> and privilege. I have to complete 10 observations per month. I have never failed
> to complete my observations. While I understand your concern, it is not necessary
> nor appreciated and the threatening undertones do not make me shiver in my
> boots. When and where I do them, and how I record them is entirely up to me, and
> entirely within my rights to do so according to the procedures and rules of the

system. I will not change how I choose to do them simply because you deem it necessary to attempt to threaten me about them."

14. In any event, based on Plaintiff Hobson's receipt of Mr. Kelley's inappropriate and demeaning text message in the fall of 2009, both individuals agreed to engage in mediation to attempt to iron out any differences that they had with one another. This mediation took place in April 2010, and as a result, both individuals entered into a Memorandum of Understanding (MOU) that required, among other issues, to work to share important safety and other information with each other, and that Mr. Kelley would make more of an effort to explain and communicate turnovers to Plaintiff Hobson. For the balance of 2010 and during 2011, Plaintff Hobson did not experience any issues in the workplace which caused her concern.

15. At the beginning of 2012, at which time Mr. Kelley was in a management role over Plaintiff Hobson, Mr. Kelley alleged that Plaintiff Hobson violated Amtrak's attendance reporting policy by marking herself off for being sick and being absent from a regular assignment after supposedly receiving her assignment at a previously scheduled safety meeting. Sensing that the proposed scheduling by Mr. Kelley was done so in an unfair manner, Plaintiff Hobson advised Mr. Kelley as such in an e-mail on January 20, 2012 which stated:

> "What you say goes however you are not always right. What you [sic] saying to me is I have to work the floor the day Ron is scheduled to do it. And work the Floor on Saturday. I'm not going to be 2nd shift mat for you guys to wipe your feet on. On Thursday when it's three people here I can stay my behind right here and have help on the floor I don't have to go. Jason can go I don't care."

16. On January 26, 2012, Plaintiff Hobson further attempted to obtain clarification as to whether she in fact violated an established protocol based on the scheduling issue by asking Mr. Kelley via email:

> "I marked off Friday Jan 20 and I marked back up last night. Is there a problem with the mark off system? Or did I violate some rule I don't know about?"

17. Contrary to the letter and spirit of the previously executed MOU between Plaintiff Hobson and Mr. Kelley, Plaintiff Hobson received no response to the aforementioned inquiry. Therefore, on January 27, 2012, Plaintiff Hobson sought assistance from her union representative, Michael Lachica (Foreman and Union Representative; White/Male), and relying on Mr. Lachica's advice as Union Representative inquired as follows:

> "Mike: I spoke to Mr. Mead briefly last night before I left work about No call No show for Tues and Wed. He came in last night to give a class and really didn't want to deal with it last night he said. I sent Mr. Mead an e-mail in regards to the code 1160 for those two days however he won't be in the office tomorrow. Mr. Mead did mention to me to talk to my union. The mark off tape does have a record of me marking off and marking back up for duty on my shift Thursday. I was scheduled and worked straight time on 1st shift on my day off Monday and marked back up for duty on my shift 12 hours in advance. Please do what you can to fix this and keep me informed."

Mr. Lachica responded as follows:

> "Once you came into work and worked then it's my understanding that you will be considered as no longer off sick and you then needed to be back to work on Tuesday so I have to wait on meade and Labor relation's to see what they are going to do."

18. On February 17, 2012, after not hearing from Mr. Lachica as to what was going to happen as a result of the scheduling allegations, Plaintiff Hobson upon being made aware that her job was in jeopardy based on her receipt of a "Notice of Formal Investigation" wrote to Mr. Luchica as follows referencing and attaching the e-mail authored by Mr. Foxley referenced above:

> "Mike: This is a copy of an e-mail from a Foreman II too Mr. Mead. I want to know why they are trying to fire me when this e-mail is a lot more inflammatory [sic] then the one I wrote. Nothing was said to him. I'm calling Gender discrimination."

Mr. Lachica, subtly agreeing with Plaintiff Hobson's characterization, responded as follows:

> "This is ok but remember that this cannot be brought up in your hearing due to the fact that it has no bearing on your case because it was not part of what went

on or what transpired on that date and had no effect on this incident and since it was not part of your incident then it cannot be entered into evidence, ***but maybe down the line at a certain time and place this can be used*** but at the trial we cannot use this." (emphasis added).

19. Despite Mr. Lachica being aware of Plaintiff Hobson's hearing scheduled to take place on Wednesday, February 22, 2012, he never provided any guidance or assistance previously requested by the Plaintiff per her previous request to stay informed. Instead, only days before the hearing, Mr. Lachica spoke with the Plaintiff and in abrogation of his duties as a Union Representative who, in this capacity, was supposedly to serve in the best interest of Plaintiff Hobson, told her in a conversation that "there were statements out there against her interest" and without showing her any of these "statements", and without giving any indication that a substantial and thorough investigation by Amtrak was done, told Plaintiff Hobson that she should waive her right to a formal investigation and enter into a Waiver Agreement admitting her guilt to the charges and specifications outlined in the Notice of Formal Investigation. Plaintiff Hobson, believing that Mr. Luchica was acting in her best interest, heeded to his advice and entered into a Waiver Agreement on February 20, 2012 which had the detrimental consequence of a "(30) [T]hirty Working Days Suspension To Be Served Immediately in increments of 1 day per week starting on February 28, 2012 every Tuesday with the final day of Suspension on September 18, 2012".

20. In 2013, Plaintiff Hobson was also the target of Kris Hamilton (General Foreman; White/Male) who sought to tarnish her reputation and decision-making ability as Foreman. For example, Plaintiff Hobson was never provided any information as to how often trains would arrive on the regional tracks despite Mr. Hamilton having a responsibility to provide Plaintiff Hobson of such information. Additionally, Plaintiff Hobson was denied access to Amtrak's intranet for use by Foremen due to the addition of a password by Anthony Kelley which only

another male employee, Joseph Wilson, had access to. Also specifically on June 8, 2013, Mr.

Hamilton entered into Amtrak's database a "Record of Verbal Instruction to Employee" alleging

that Plaintiff Hobson failed to properly clean (i.e. "trash a train" in industry parlance) a train

before it left the station. After entering this reprimand into Amtrak's database, Mr. Hamilton

intentionally attempted to embarrass Plaintiff Hobson and portray her as incompetent by sending

her an email also sent to Superintendent Jeff Mead and Asst. Superintendent William Vullo

which stated:

> "If you don't see an expected train, and aren't near the computer to check on its location…Give K-tower a call and ask them where the train is. I would say 10 minutes or so after the train was supposed to arrive."

21. Upon receipt of this correspondence, Plaintiff Hobson responded candidly to all

parties to the e-mail as follows:

> "I'm going [sic] do my best to keep with where the trains are. Keep in mind Im on foot putting flags up and down for my cleaner. Signing maps after 12:00 a.m. so if a train is on the lower level it will be tough for me to get to the lower level do to the volume of trains on the tracks, poor visibility and the esculators [sic] are only coming upstairs and not going downstairs. ***I spoke to the previous Foreman who let me know that you and he have had conversations about this issue before. He was told to send you a email or give a call to the General or Foreman at the facility. He was not written up for it so I don't know why you wrote me up for my first non-trashed train***?" *Id* (emphasis added).

22. Assistant Superintendent William Vullo responded to Plaintiff Hobson indicating

that Kris Hamilton was in fact at fault for his drafting of the "Record of Verbal Instruction to

Employee" writing, in part, as follows:

> "…There is no discipline involved; the only issue is that Mr. Hamilton did not sit down with you and explain that he was entering the verbal instruction in your MERs. For that he has been informed not to enter information without the knowledge of that person…As far as the write ups in ERS by Mr. Anderson, it has been passed to another agency to be removed from all the ERS's involved."

23. Even following these egregious act by Plaintiff Hobson's peers to damage her

reputation and career, the unacceptable behavior rooted in gender discrimination continued to

occur unchecked and unbridled. Specifically, in January 2014, Anthony Kelley continued to spur

his personal vendetta against Plaintiff Hobson by abusing his position of authority as Hobson's

supervisor in his capacity as General Foreman and alleging that she committed an infraction

known as "blowing the line" in industry parlance. Incredibly, he signed off as "Charging

Officer" on a "Notice of Intent to Impose Discipline" dated February 1, 2014 alleging that she

"allowed the transposition crew operating IB 2121 HST-05 to cross 10 track south de-energized

buffer blowing the line and tripping plate 25W." This correspondence was CC'd to Plaintiff's

union representative, Michael Lachica (Foreman and Union Representative; White/Male).

24. Mr. Lachica, again in abrogation of his duties, turned a blind eye to the following

evidence which was supportive of Plaintiff Hobson: 1) Plaintiff submitted to a drug test

following the blowing of the line which was reported as "Negative", 2) Anthony Spicer, a yard

assignment worker responsible for moving the Acela trains to and from the station in a prompt

manner, submitted a written statement wherein he admitted that Mike Hans via radio

communication told Spicer to direct the train into the building, and also admitted that "when we

crossed the main wire to the buffer on track 10 we blew the line", 3) pipefitter Charles Harris

submitted a written statement to Anthony Kelley days following the incident stating that at the

time  the train blew the line, "[he] noticed Foreman Sinaloa Hobson working in her cubicle", and

4) Plaintiff Hobson submitted a written statement explicitly stating that "she was still in [her]

office at the time it blew."

25. Similar to the events in 2012, Mr. Lachica, being aware of the allegations levied

against Plaintiff Hobson, never provided any guidance or assistance in the capacity of union

representative as to her rights as a union member despite Plaintiff's requests to do so. Knowing

that Plaintiff Hobson feared losing her job as one of only two female Foremen in the High Speed

Rail Department, Mr. Lachica through his inaction again coaxed Plaintiff Hobson into waiving

her right to a formal investigation and admitting guilt to the alleged infractions trumped up by

Plaintiff's nemesis and supervisor Mr. Kelley resulting in a Waiver Agreement (dated February

18, 2014) being placed in Plaintiff's personnel file within two and a half weeks of the Plaintiff's

initial receipt of the "Notice of Intent to Impose Discipline" dated February 1, 2014. Moreover,

neither Superintendent Jeff Mead nor Assistant Superintendent William Vullo intervened as they

should have to prevent this particular formal reprimand from being instituted and memorialized

as another strike against Plaintiff Hobson, particularly given their direct knowledge of Anthony

Kelley's checkered historical relationship with Plaintiff Hobson, his prior text message showing

his animus towards Plaintiff Hobson (i.e. "Hobson is gonna be another lazy ass woman on da

floor….If she comes to 3rd my guys r gonna eat her alive."), and the clear conflict of interest that

existed with him in a position of authority and being a "Charging Officer" in light of this prior

history with Plaintiff Hobson.

26. Based on the systemic gender discrimination which permeated Plaintiff's

work environment, on September 9, 2014, Plaintiff Hobson was deposed in another matter,

Alexandra Leach v. National Railroad Passenger Corp., Case No. 1:12-cv-1495, which involved

meritorious allegations similar to those set forth by Plaintiff Hobson. During that deposition, she

testified under oath as follows regarding the toxic and discriminatory work environment as it

pertained to female employees:

> "Q: Why were you going through the mediation program? Was it a complaint that
> you made?
> A: Yeah. I had a problem with another employee.
> Q: Okay. Who was that employee?
> A: Anthony Kelly.
> Q: What was the nature of the problem?

A: He wrote a text and accidentally sent it to me and he called me a lazy ass female. So I chose to go through mediation, for him and I to sit down and squash it.

Q: Okay. Okay. So you found the lazy ass female comment offensive?

A: I did."

       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Did [the Plaintiff] say that she felt like she was being harassed?

 A: I don't know if she used the word "harassed" at the time. The way it came across to me was, it was something going on within Amtrak that was unfair and she was very displeased with it, as well as I. The environment in which we work in, you know, is not always conducive to like an office job or whatever, and sometimes it's kind of harsh, it's a very harsh environment."

       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Yesterday, we took Mr. Mead's deposition, and he told us a little bit about hearing sexual language and comments and conduct that is violative [sic] of the antiharassment policy—

A: Uh-huh.

Q:--in the workplace.

A: Uh-huh.

Q: And you know that Mr. Mead is the superintendent, correct?

A: Of course, yes.

Q: The question was, did Mr. Mead ever sit you all down, the managers, and tell you about the things that he'd observed in the workplace?

A: I can't---I-no, he did not. I was not privy to that."

       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Is there a retaliatory climate there? Don't cry [telling witness].

   MS. GAINES: Don't cry. I'm not doing it to make you cry.

   MR. SAKALLARIS: And you're attempting to coach, now you're attempting to coach the witness.

   BY MS. GAINES:

 Q: Is there a retaliatory climate there?

   MR. SAKALLARIS: Objection to the form of the question.

 A: It's—it's a very—it's a hostile environment and—and a lot goes on at Amtrak that we're not happy with, and that's the only way I can describe it. I've said it before and I'm saying it again."

       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: And that's why you have tears welling up in your eyes, correct, because you're afraid that by telling the truth here, you're gonna lose your job?

   MR. SAKALLARIS: Same objections.

   BY MS. GAINES:

Q: Don't make me cry, but that's the truth, isn't it, Ms. Hobson?

   MR. SAKALLARIS: Same objections.

   THE WITNESS: (Nods.)

MS. GAINES: You're shaking your head. I need the verbal answer.
MR. SAKALLARIS: Same objections.
THE WITNESS: Yes."
            ***********************************************

"Q: When you say that it's hostile, do you mean for women to work in the workplace?
A: It is. It's--- it's a very—it's---it's a hostile environment."
            ***********************************************

"Q: And do you think that there are violations of the antidiscrimination policy in your workplace?
A: There might be some yeah.
Q: And you've observed some, haven't you?
            MR. SAKALLARIS: Objection to form of the question.
            THE WITNESS: Yes, I have."
            ***************************************************

" THE WITNESS: It is unfair treatment, that does happen.
BY MS. GAINES: Q: And is that in comparison to how other males are treated in the workplace?
A: Correct."[6]

27. Following Plaintiff Hobson's deposition, she continued to be the subject of gender-based discriminatory treatment and retaliation for having provided truthful testimony about the conditions which she observed. Specifically, in June 2015, Plaintiff Hobson took Family and Medical Leave Act (FMLA) leave to which she was entitled, however, Anthony Kelley made numerous false reports to Plaintiff Hobson's FMLA coordinator to the effect that Plaintiff Hobson was abusing Amtrak's FMLA policy. After being contacted by her FMLA coordinator, Plaintiff Hobson requested clarification on the issue from the Director of Labor Relations and her union representative Mr. Lachica, explicitly telling Mr. Lachica via email "Mr. Lachica if you can shed some light on the subject, you know I welcome any feedback from you. Your attention to this matter could save my job one day." To wit, Plaintiff Hobson never received any response

---

[6] Deposition of Sinaloa Hobson taken in the case of <u>Alexandra Leach v. National Railroad Passenger Corp.</u>, Case No. 1:12-cv-1495 at p. 12, ll.8-21; p. 28, ll.3-12; p. 35-36; p. 50-51; p. 53-54; p. 56, ll.6-9; p.66-67.

from the Director of Labor Relations or, more importantly, Mr. Lachica despite her plea for

assistance. On June 24, 2015, Plaintiff Hobson even contacted Amtrak's EEO officer

complaining that "[h]e [Anthony Kelley] is making this FMLA situation personal. He and I have

history in the pass with DRO. Today was the second phone call from my FMLA coordinator

about Mr. Kelley contacting them. I also have emails from him telling me to have my doctor fill

out a ADA request. How do I proceed???" Again, despite her plea for assistance, Plaintiff

Hobson was ignored and denied any assistance with her problems with Mr. Kelley and his

deliberate attempts to degrade her sense of responsibility. During this time, Anthony Kelley

continued to exhibit discriminatory favoritism towards male employees.  On July 8, 2015,

Anthony Kelley approved Joseph Wilson for one (1) hour of overtime despite Mr. Wilson only

working twenty-four minutes according to Amtrak's WMS Timekeeping System.

28. Later in July 2015, Plaintiff Hobson was again the target of Mr. Lachica and General

Foreman Kris Hamilton's attempt to sabotage her work ethic and disciplinary record. The

vendetta-based *modus operandi* of Mr. Hamilton was verified by Plaintiff Hobson being told by

employee LaTanya Anderson that she (LaTanya) overheard Mr. Hamilton tell another male

employee that "as soon as I become a charging officer, I am coming for her [Claimant Hobson]."

Moreover, specifically, on July 23, 2015 Mr. Hamilton as "Charging Officer" issued to Plaintiff

Hobson a "Notice of Intent to Impose Discipline" for not carrying her hand held Amtrak radio on

July 8, 2015, acting in an "unprofessional manner" on that same date, and failing to remove a

trash wagon from a live track on July 17. Anthony Kelley did not perform any investigation as to

the root cause of the incident involving the trash wagon. This Notice was CC'd to Superintendent

Jeff Mead, Assistant Superintendent William Vullo, union representative Michael Lachica,

Susan Mangatal of the Office of Disciplinary Investigations, and a copy was placed in Plaintiff

Hobson's personnel file.

29. However, Mr. Hamilton's charges were absolutely baseless given that first, there

were known problems with radio interferences which actually interfered with the ability of

Amtrak employees- particularly Foremen such as Plaintiff Hobson- to carry out their duties

effectively as indicated by the fourth point on employee Joseph Wilson's email to management

below:

> From: Wilson, Joseph
> Sent: Monday, July 27, 2015 9:23 AM
> To: Mead, Jeffrey; Anderson, Jeffrey; Gutierrez, Gary; Hamilton, Kris; Hans, Michael;
> Hindman, Frederick; Kelley, Anthony; Middleton, Starvos J; Vullo, William; Akinsheye,
> Addae; Duffy, Elmer C; Francis, Kwesi; Grimes, Robert; Hobson, Sinaloa; Hutchinson,
> Christian; Kanu, Alusine; Lachica, Michael; Schmidt, Ronald; Wingfield, Roger
> Subject: RE: Down Time
>
> My two cents, you asked for ideas, not sure why most are ……..
>
> As a long time AMTRAK employee there have been many changes some good some not
> so much. One of the suggestions has been to have all employees evolved with the
> operation at hand. Why, when the BLUE FLAGS come down it is only the
> SUPERVISOR working? I see no reason why the crafts are not walking the trains
> checking the derailers chocks, grounding sticks & checking the many thing the
> supervisor must do. The SUPERVIRSOR [sic] should have all ready walked the trains
> many   times. There are cameras all over but none for the SUPERVISOR to use with a
> monitor in the box above the MODS panel, we should be able to see the derailer &
> North PC with out having to worry about blowing the line with all keys in place.
> 2. Paid for the first day of sick leave.
> 3. Ten hour, four day work week.
> 4. Fix the radio interferences at the station.
> 5. Cell phone for all SUPERVISORS.
> 6. HSR polo shirts (still wearing my MARC polo )

30. Second, employee Joseph Wilson was actually the individual who was aware of the

maintenance situation before Plaintiff Hobson's shift on the day in question, and it was Mr.

Wilson who failed to properly correct the situation. Additionally, Mike Rubin, who was on duty

prior to Plaintiff Hobson on the day in question, had knowledge of the train maintenance situation and reported the maintenance situation, and again Joseph Wilson failed to correct it; additionally, no other Amtrak employee (including Mr. Wilson or Chris Groom (both of whom were males)) received any formal discipline or reprimand similar to that of Plaintiff Hobson. Third, Plaintiff Hobson was never informed as to how or to whom she "acted in an extremely unprofessional manner." Yet and still, on July 24, 2015 at approximately 4:15, a trash wagon was run over by a regional train on Platform 18 before Plaintiff Hobson's arrival on her shift, however Amtrak did nothing to impose formal disciple on any male employees, particularly Anthony Kelley who was on duty on this particular date.

31. As a result of receiving the "Notice of Intent to Impose Discipline", and again requesting assistance from union representative Mr. Lachica, Plaintiff Hobson was informed that filing a Waiver Agreement was in her best interest to maintain her employment with Amtrak. Therefore, believing that to be the case, Plaintiff Hobson executed a Waiver Agreement on July 29, 2015 resulting in her "being terminated as an ARASA Supervising Technician and [being removed from] the ARASA seniority roster, [returning] to [her] previous craft as an IBEW electrician [with the ability to] exercise her seniority rights for job placement." She was also suspended for thirty (30) calendar days starting Thursday, July 30 2015 and ending Friday, August 29, 2015.

32. On or about August 1, 2015, Plaintiff Hobson, being frustrated with having to endure what she believed to be unfair and discriminatory treatment, spoke with Mr. Lachica explaining that she wanted to appeal the decision resulting in the Waiver Agreement. Mr. Lachica only told Plaintiff Hobson that she would not be able to file an appeal because she executed the Waiver Agreement. However, Mr. Lachica deliberately failed to inform Plaintiff Hobson of her

unequivocal appellate rights via the "Agreement Between The National Railroad Passenger Corporation And Its Employees Represented By The American Railway Supervisors Association" ("Union Agreement") which sets forth the working conditions of Foremen such as Plaintiff Hobson. In fact, according to the Union Agreement, it stated as follows:

> "RULE 19-DISCIPLINE-INVESTIGATION-APPEAL
> (a) Offense(s) suggest discipline short of dismissal.
> (5) If the employee is dissatisfied with the decision, he shall have the right to appeal, either in person or through his duly accredited representative, to the next higher designated officer, and a conference shall be granted, provided written request is made to such officer and copy furnished to the officer whose decision is appealed within 30 calendar days of the date of receipt of a copy of the transcript. A decision will be rendered by the higher designated officer within 30 calendar days from the date the appeal is received or the date of conference, whichever is later. Any appeal from such decision shall be made to the Director of Labor Relations."

33. Rather than provide sound, prudent advice in accordance with Union Agreement, Mr. Lachica, being derelict in his duties, admitted to Plaintiff Hobson as to the retaliatory nature of the environment at Amtrak in the High Speed Rail Department which would be expected if Plaintiff Hobson was to pursue her rights to which she was entitled by sending her the following text message:

> "After talking to you I called Kelley and told him about the [sic] what you asked me and what you want to do, and he reached out to Bridget and he is awaiting a reply or call from her about this request. May I ask who you spoke to about doing this and what is the reasoning behind this, you said that you were tired of fighting and just wanted to get away. *You know that if they reverse this they will go for your job and probably amend the charges and add a few*." (emphasis added).

Needless to say, Claimant Hobson never heard anything further from either Mr. Lachica, Anthony Kelley or Bridget Donohue (Director of Labor Relations Department) regarding the appropriate measures to appeal the decision which resulted in her suspension and subsequent reduction in status, pay, seniority, and furthermore resulted in her seeking counseling and

psychiatric care and treatment due to the emotional distress caused by the discriminatory actions of Amtrak's High Speed Rail Department and their agents, servants, and employees.

## COUNT I
## Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 USC §2000e. et seq.

34. Plaintiff Hobson hereby adopts and incorporates paragraphs 1-33 as though fully stated herein.

35. The Defendant's conduct as alleged herein constitutes discrimination based on gender in violation of Title VII. Specifically, Plaintiff, a female, was a member of a protected class. On Thursday, July 30 2015, Plaintiff suffered an adverse employment action by being terminated as an ARASA Supervising Technician and being removed from the ARASA seniority roster. This adverse employment action gives rise to an inference of discrimination based on the vast history of derogatory and discriminatory treatment experienced by Plaintiff Hobson at the hands of her male co-workers in the High Speed Rail Department. Since Plaintiff Hobson transitioned to the High Speed Rail Department, Defendant, and its agents, servants, and employees, Defendant has treated her differently from and less preferably than similarly situated male employees, subjecting Plaintiff to discriminatory disciplinary measures, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions and Plaintiff's rate of pay in violation of Title VII.

36. Furthermore, Defendant, and the policies, practices, and/or procedures enacted and engaged in by its agents, servants, and employees have resulted in disparate treatment affecting Plaintiff Hobson with respect to the terms and conditions of her employment. Defendant, by and through its agents, servants, and employees, has perpetuated the disparate treatment affecting Plaintiff Hobson through conduct that has been intentional, deliberate, willful, malicious, reckless,

and/or conducted in callous disregard of the rights of Plaintiff Hobson, entitling Plaintiff Hobson to punitive damages.

37. As a proximate cause and result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay and front pay, lost bonuses, lost benefits, loss of seniority status, and attorneys' fees and costs. Plaintiff is entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from this Defendant under Title VII.

38. As a further result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

39. WHEREFORE, Plaintiff Hobson hereby claims against Defendant National Railroad Passenger Corporation five hundred thousand dollars ($500,000.00) in compensatory damages, and one million dollars ($1,000,000) in punitive damages, prejudgment interest, attorney's fees, costs related to the proceedings, back pay, front pay and any such other and further relief as justice may require including, but not limited to expungement of Plaintiff's personnel file, reinstatement of Plaintiff's seniority position, and placement within the organization in the same or substantially similar position within a department with a non-antagonistic environment.

## COUNT II
## HARRASSMENT BASED ON GENDER

40. Plaintiff Hobson hereby adopts and incorporates paragraphs 1-39 as though fully stated herein.

41. The Defendant's conduct as alleged herein constituted a hostile working environment in violation of Title VII as the harassing conduct was unwelcome, based on Plaintiff's gender, was sufficiently severe and pervasive to alter the conditions of Plaintiff Hobson's employment

and create an abusive working environment, and was imputable to the Defendant and its agents, servants, and employees. Additionally, the Defendant, even after knowing of the harassment, failed to promptly correct the harassing behavior.

42. At the time of Plaintiff's application to become a "Foreman" in the High Speed Rail Department, Anthony Kelley was perpetuating a gender-based biased attitude toward Plaintiff's perceived capabilities as a "Foreman" which was only brought to the attention of the Plaintiff by chance as she received the following text message drafted on September 11, 2009 by Anthony Kelley which was intended for a third party but accidentally sent to Plaintiff Hobson. It stated:

> "Hobson is gonna be another lazy ass woman on da floor…Then she keeps downing 3rd and comparing us to 2nd. If she comes to 3rd my guys r gonna eat her alive."

Plaintiff Hobson forwarded this text message to Superintendent Jeff Mead, however, Mr. Meade took no corrective action whatsoever.

43. Immediately, after assuming the position of "Foreman", Plaintiff Hobson's trials and tribulations due to the gender-based discriminatory animus increased exponentially. For example, when Plaintiff Hobson would arrive for her shift and request at the outset a schedule of High Speed Rail trains that would be released, other male individuals employed by Amtrak in the capacity of a "Foreman" would deliberately refuse to provide her this necessary information, thereby unnecessarily increasing the risk that trains would not run on schedule under Plaintiff's watch and therefore be attributed to Plaintiff's perceived lack of attention to detail and perceived failure to competently perform her job. Also, specifically in late November 2009, Plaintiff Hobson approached a General Foreman in the High Speed Rail Department to obtain information related to the turnover ratio for High Speed Rail trains that she felt was necessary in order to effectively participate in a meeting that was scheduled to take place in December 2009. After

requesting this information-much to Plaintiff Hobson's surprise- an impromptu meeting was convened on December 3, 2009 with Superintendent Jeff Mead, Assistant Superintendent "Bill" Vullo, and "Foreman" (and Union Representative) Michael Lachica wherein Mr. Mead told Plaintiff Hobson in front of her superiors "You need to get your s**t together!" Mr. Mead did not at this time provide any clarification for the basis or substance of his embarrassing expletive-laden comment.

44. To wit, even after this Defendant was aware that Plaintiff had executed an MOU with her superior Anthony Kelley in April 2010, Plaintiff's employer failed to take any corrective action to ameliorate the inherent conflict of interest and subsequent hostile environment caused by having Anthony Kelley remain as Plaintiff's supervisor. Moreover, the continuing behavior of Mr. Kelley, as well as other male supervisors in Plaintiff's department were severe and pervasive enough that she routinely sought assistance from her union representative to no avail, as he perpetuated the hostile working environment by failing to timely and properly advise Plaintiff as to her options of recourse under the governing collective bargaining agreement and instead coaxed Plaintiff Hobson into unnecessarily filling up her personnel file with Waiver Agreements and thereby placing Plaintiff's job security in jeopardy.

45. In 2013, Plaintiff Hobson was also the target of Kris Hamilton (General Foreman; White/Male) who sought to tarnish her reputation and decision-making ability as Foreman. For example, Plaintiff Hobson was never provided any information as to how often trains would arrive on the regional tracks despite General Foremen such as Mr. Hamilton being charged with informing Plaintiff Hobson of such information. Additionally, Plaintiff Hobson was denied access to Amtrak's intranet for use by Foremen due to the addition of a password by Anthony Kelley which only male employees had access to. Also specifically on June 8, 2013, Mr.

Hamilton entered into Amtrak's database a "Record of Verbal Instruction to Employee" alleging that Plaintiff Hobson failed to properly clean (i.e. "trash a train" in industry parlance) a train before it left the station. After entering this reprimand into Amtrak's database, Mr. Hamilton intentionally attempted to embarrass Plaintiff Hobson and portray her as incompetent by sending her an email also sent to Superintendent Jeff Mead and Asst. Superintendent William Vullo which stated:

> "If you don't see an expected train, and aren't near the computer to check on its location…Give K-tower a call and ask them where the train is. I would say 10 minutes or so after the train was supposed to arrive."

46. Upon receipt of this correspondence, Plaintiff Hobson responded candidly to all parties to the e-mail as follows:

> "I'm going [sic] do my best to keep with where the trains are. Keep in mind Im on foot putting flags up and down for my cleaner. Signing maps after 12:00 a.m. so if a train is on the lower level it will be tough for me to get to the lower level do to the volume of trains on the tracks, poor visibility and the esculators [sic] are only coming upstairs and not going downstairs. ***I spoke to the previous Foreman who let me know that you and he have had conversations about this issue before. He was told to send you a email or give a call to the General or Foreman at the facility. He was not written up for it so I don't know why you wrote me up for my first non-trashed train?"*** Id (emphasis added).

Assistant Superintendent William Vullo responded to Plaintiff Hobson indicating that Kris Hamilton was in fact at fault for his drafting of the "Record of Verbal Instruction to Employee" writing, in part, as follows:

> "…There is no discipline involved; the only issue is that Mr. Hamilton did not sit down with you and explain that he was entering the verbal instruction in your MERs. For that he has been informed not to enter information without the knowledge of that person…As far as the write ups in ERS by Mr. Anderson, it has been passed to another agency to be removed from all the ERS's involved."

47.   Even following these egregious act by Plaintiff Hobson's peers to damage her

reputation and career, the unacceptable behavior rooted in gender discrimination continued to occur unchecked and unbridled. Specifically, in January 2014, Anthony Kelley continued to spur his personal vendetta against Plaintiff Hobson by abusing his position of authority as Hobson's supervisor in his capacity as General Foreman and alleging that she committed an infraction known as "blowing the line" in industry parlance. Incredibly, he signed off as "Charging Officer" on a "Notice of Intent to Impose Discipline" dated February 1, 2014 alleging that she "allowed the transposition crew operating IB 2121 HST-05 to cross 10 track south de-energized buffer blowing the line and tripping plate 25W." This correspondence was CC'd to Plaintiff's union representative, Michael Lachica (Foreman and Union Representative; White/Male).

48. Mr. Lachica, again in abrogation of his duties, turned a blind eye to the following evidence which was supportive of Plaintiff Hobson: 1) Plaintiff submitted to a drug test following the blowing of the line which was reported as "Negative", 2) Anthony Spicer, a yard assignment worker responsible for moving the Acela trains to and from the station in a prompt manner, submitted a written statement wherein he admitted "when we crossed the main wire to the buffer on track 10 we blew the line", 3) pipefitter Charles Harris submitted a written statement to Anthony Kelley days following the derailment stating that at the time  the train blew the line, "[he] noticed Foreman Sinaloa Hobson working in her cubicle", and 4) Plaintiff Hobson submitted a written statement explicitly stating that "she was still in [her] office at the time it blew."

49.     In June 2015, Plaintiff Hobson took Family and Medical Leave Act (FMLA) leave to which she was entitled, however, Anthony Kelley made numerous false reports to Plaintiff Hobson's FMLA coordinator to the effect that Plaintiff Hobson was abusing Amtrak's FMLA policy. After being contacted by her FMLA coordinator, Plaintiff Hobson requested

clarification on the issue from the Director of Labor Relations and her union representative Mr. Lachica, explicitly telling Mr. Lachica via email "Mr. Lachica if you can shed some light on the subject, you know I welcome any feedback from you. Your attention to this matter could save my job one day." To wit, Plaintiff Hobson never received any response from the Director of Labor Relations or, more importantly, Mr. Lachica despite her plea for assistance. On June 24, 2015, Plaintiff Hobson even contacted Amtrak's EEO officer complaining that "[h]e [Anthony Kelley] is making this FMLA situation personal. He and I have history in the pass with DRO. Today was the second phone call from my FMLA coordinator about Mr. Kelley contacting them. I also have emails from him telling me to have my doctor fill out a ADA request. How do I proceed???" Again, despite her plea for assistance, Plaintiff Hobson was ignored and denied any assistance with her problems with Mr. Kelley and his deliberate attempts to degrade her sense of responsibility.

50.     As a direct result and proximate cause of the acts and omissions by Defendant's agents, servants, and employees, Plaintiff Hobson suffered emotional distress, mental anguish, embarrassment, stress, financial loss and other economic and non-economic injuries. Furthermore, the actions of the Defendant's agents, servants, and employees was conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Hobson, entitling Plaintiff Hobson to punitive damages.

51. WHEREFORE, Plaintiff Hobson hereby claims against Defendant National Railroad Passenger Corporation five hundred thousand dollars ($500,000.00) in compensatory damages, and one million dollars ($1,000,000) in punitive damages, prejudgment interest, attorney's fees, costs related to the proceedings, back pay, front pay and any such other and further relief as justice may require including, but not limited to expungement of Plaintiff's personnel file,

reinstatement of Plaintiff's seniority position, and placement within the organization in the same or substantially similar position within a department with a non-antagonistic environment.

**COUNT III**
**RETALIATION**

52.     Plaintiff Hobson hereby adopts and incorporates paragraphs 1-51 as though fully stated herein.

53.     The Defendant's conduct as alleged herein constituted retaliation in violation of Title VII as the Plaintiff was engaged in statutorily protected activity, suffered an adverse employment action at the hands of her employer, and a causal link exists between the protected activity and the adverse action. Specifically, on September 9, 2014, Plaintiff Hobson was deposed in another matter, Alexandra Leach v. National Railroad Passenger Corp., Case No. 1:12-cv-1495, which involved meritorious allegations similar to those set forth by Plaintiff Hobson. During that deposition, she testified under oath as follows regarding the toxic and discriminatory work environment as it pertained to female employees. Following the deposition, Plaintiff was subjected to an adverse employment action in 2015 when Plaintiff Hobson became the target of Mr. Lachica and General Foreman Kris Hamilton. The suspicion of the vendetta-based *modus operandi* of Mr. Hamilton was verified by Plaintiff Hobson being told by employee LaTanya Anderson that she (LaTanya) overheard Mr. Hamilton tell another male employee that "as soon as I become a charging officer, I am coming for her [Claimant Hobson]." Moreover, specifically, on July 23, 2015 Mr. Hamilton as "Charging Officer" issued to Plaintiff Hobson a "Notice of Intent to Impose Discipline" for not carrying her hand held Amtrak radio on July 8, 2015, acting in an "unprofessional manner" on that same date, and failing to remove a trash wagon from a live track on July 17. This Notice was CC'd to Superintendent Jeff Mead, Assistant Superintendent William Vullo, union representative Michael Lachica, Susan Mangatal

of the Office of Disciplinary Investigations, and a copy was placed in Plaintiff Hobson's

personnel file. However, Mr. Hamilton's charges were absolutely baseless given that first, there

were known problems with radio interferences which actually interfered with the ability of

Amtrak employees- particularly Foremen such as Plaintiff Hobson- to carry out their duties

effectively.

54. Second, employee Joseph Wilson was actually the individual who was aware of the

maintenance situation before Plaintiff Hobson's shift on the day in question, and it was Mr.

Wilson who failed to properly correct the situation. Additionally, Mike Rubio, who was on duty

prior to Plaintiff Hobson on the day in question, had knowledge of the train maintenance

situation and, again Joseph Wilson failed to correct it; additionally, no other Amtrak employee

(including Mr. Wilson or Chris Groom (both of whom were males)) received any formal

discipline or reprimand similar to that of Plaintiff Hobson. Third, Plaintiff Hobson was never

informed as to how or to whom she "acted in an extremely unprofessional manner." Yet and still,

on July 24, 2015 at approximately 4:15, a trash wagon was run over by a regional train on

Platform 18 before Plaintiff Hobson's arrival on her shift, however Amtrak did nothing to

impose formal disciple on any male employees, particularly Anthony Kelley who was on duty on

this particular date.

55. As a result of receiving the "Notice of Intent to Impose Discipline", and again

requesting assistance from union representative Mr. Lachica, Plaintiff Hobson was informed that

filing a Waiver Agreement was in her best interest to maintain her employment with Amtrak.

Therefore, believing that to be the case, Plaintiff Hobson executed a Waiver Agreement on July

29, 2015 resulting in her "being terminated as an ARASA Supervising Technician and [being

removed from] the ARASA seniority roster, [returning] to [her] previous craft as an IBEW

electrician [with the ability to] exercise her seniority rights for job placement." She was also

suspended for thirty (30) calendar days starting Thursday, July 30 2015 and ending Friday,

August 29, 2015.

56. On or about August 1, 2015, Plaintiff Hobson, being frustrated with having to endure

what she believed to be unfair and discriminatory treatment, spoke with Mr. Lachica explaining

that she wanted to appeal the decision resulting in the Waiver Agreement. Mr. Lachica only told

Plaintiff Hobson that she would not be able to file an appeal because she executed the Waiver

Agreement. However, Mr. Lachica deliberately failed to inform Plaintiff Hobson of her

unequivocal appellate rights via the "Agreement Between The National Railroad Passenger

Corporation And Its Employees Represented By The American Railway Supervisors

Association" ("Union Agreement") which sets forth the working conditions of Foremen such as

Plaintiff Hobson. In fact, according to the Union Agreement, it stated as follows:

> "RULE 19-DISCIPLINE-INVESTIGATION-APPEAL
> (a) Offense(s) suggest discipline short of dismissal.
> (5) If the employee is dissatisfied with the decision, he shall have the right to
> appeal, either in person or through his duly accredited representative, to the
> next higher designated officer, and a conference shall be granted, provided
> written request is made to such officer and copy furnished to the officer
> whose decision is appealed within 30 calendar days of the date of receipt of a
> copy of the transcript. A decision will be rendered by the higher designated
> officer within 30 calendar days from the date the appeal is received or the
> date of conference, whichever is later. Any appeal from such decision shall be
> made to the Director of Labor Relations."

57. Rather than provide sound, prudent advice in accordance with Union Agreement, Mr.

Lachica, being derelict in his duties, admitted to Plaintiff Hobson as to the retaliatory nature of

the environment at Amtrak in the High Speed Rail Department which would be expected if

Plaintiff Hobson was to pursue her rights to which she was entitled by sending her the following

text message:

"After talking to you I called Kelley and told him about the [sic] what you asked me and what you want to do, and he reached out to Bridget and he is awaiting a reply or call from her about this request. *May I ask who you spoke to about doing this and what is the reasoning behind this, you said that you were tired of fighting and just wanted to get away. You know that if they reverse this they will go for  your job and probably amend the charges and add a few*." (emphasis added).

Needless to say, Claimant Hobson never heard anything further from either Mr. Lachica, Anthony Kelley or Bridget Donohue (Director of Labor Relations Department) regarding the appropriate measures to appeal the decision which resulted in her suspension and subsequent reduction in status, pay, seniority, and furthermore resulted in her seeking counseling and psychiatric care and treatment due to the emotional distress caused by the discriminatory actions of Amtrak's High Speed Rail Department and their agents, servants, and employees.

58. The causal link between the protected activity and the adverse action is evident not only based on the timing of the adverse action in relation to the protected activity engaged in by the Plaintiff, but also based on the admission of Defendant's agent, servant, and/or employee, General Foreman Kris Hamilton, that "as soon as I become a charging officer, I am coming for her [Plaintiff Hobson]," as it was known to Hamilton that Plaintiff Hobson had previously testified about the chauvinistic, discriminatory, harassing and retaliatory environment.

59. Defendant's supervisors, agents, servants, and employees have engaged in the course of conduct described in the allegations of this Count while acting in the course, scope and furtherance of their agency and employment relationship with Defendant.

60. As a direct result and proximate cause of the acts and omissions by Defendant's agents, servants, and employees, Plaintiff Hobson suffered emotional distress, mental anguish, embarrassment, stress, financial loss and other economic and non-economic injuries. Furthermore, the actions of the Defendant's agents, servants, and employees was conduct that

31

was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Hobson, entitling Plaintiff Hobson to punitive damages.

61.  WHEREFORE, Plaintiff Hobson hereby claims against Defendant National Railroad Passenger Corporation five hundred thousand dollars ($500,000.00) in compensatory damages, and one million dollars ($1,000,000) in punitive damages, prejudgment interest, attorney's fees, costs related to the proceedings, back pay, front pay and any such other and further relief as justice may require including, but not limited to expungement of Plaintiff's personnel file, reinstatement of Plaintiff's seniority position, and placement within the organization in the same or substantially similar position within a department with a non-antagonistic environment.

Governor E. Jackson, III /s/
Governor E. Jackson, III (Bar No. 1002797)
Law Office of Governor Jackson, III LLC
400 E. Joppa Rd.
Suite 50
Towson, Maryland 21286
(410) 528-5150

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Sinaloa Hobson                                      *
6232 Gothic Lane
Bowie, Maryland 20720
                                                    *
v.                                                       Case No.: _____

National Railroad Passenger Corporation
(AMTRAK)                                            *

*Defendant*
*********************************************************************************

### PRAYER FOR JURY TRIAL

Plaintiff hereby requests that all matters set forth in the Complaint be tried by a jury.

Governor E. Jackson, III /s/ _____
Governor E. Jackson, III (Bar No. 1002797)
Law Office of Governor Jackson, III LLC
400 E. Joppa Rd.
Suite 50
Towson, Maryland 21286
(410) 528-5150

*Attorney for Plaintiff*
